FILED
John E. Triplett, Clerk of Court
United States District Court

By jamesburrell at 4:02 pm, May 08, 2025

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **INDICTMENT NO.**   4:25cr-56 |
| | ) | |
| v. | ) | |
| | ) | |
| **ANTWOINE ALLEN,** | ) | **18 U.S.C. § 1962(d)** |
| a/k/a "Bity," | ) | **RICO Conspiracy** |
| **RYAN BRANDT,** | ) | |
| a/k/a "Street Life," | ) | **18 U.S.C. §§ 1959(a)(1) & 2** |
| a/k/a "Robert Kraft" | ) | **Murder in Aid of Racketeering** |
| **CALVIN CHEGE,** | ) | |
| a/k/a "Breezy," | ) | **18 U.S.C. §§ 924(j) & 2** |
| **ANTONIO CLARK,** | ) | **Causing Death Through the Use of** |
| a/k/a "Ya-Yo" | ) | **a Firearm** |
| **HAKEEM CURRY,** | ) | |
| a/k/a "ET Hak," | ) | **18 U.S.C. § 1959(a)(5)** |
| **AMIR DOUGLAS,** | ) | **Conspiracy to Commit Murder in** |
| a/k/a "Hotboy," | ) | **Aid of Racketeering** |
| **LATOYA EDWARDS** | ) | |
| a/k/a "K-Murda," | ) | **18 U.S.C. §§ 1343 & 1349** |
| **BRANDON GILBERT,** | ) | **Wire Fraud Conspiracy** |
| a/k/a "Blaxkdamenace," | ) | |
| **IMANI GORDON,** | ) | **21 U.S.C. § 846** |
| a/k/a "Juicy," | ) | **Drug Conspiracy** |
| **HASSAN HARRIS,** | ) | |
| a/k/a "Hocus," | ) | |
| **BYRON HOPKINS,** | ) | |
| a/k/a "Kosher," | ) | |
| **BRIAN HORNE,** | ) | |
| a/k/a "Braveheart," | ) | |
| **QUINN HOWARD,** | ) | |
| a/k/a "DB Que," | ) | |
| a/k/a "Q," | ) | |
| **ANTHONY JERNIGAN,** | ) | |
| a/k/a "Hell Raiser," | ) | |
| **BRANDON JONES,** | ) | |
| a/k/a "Big B," | ) | |
| **LEROY JONES** | ) | |
| a/k/a "Roy," | ) | |
| **TERRELL KING,** | ) | |
| a/k/a "Drip," | ) | |

ROBINSON LAZALA,                              )
    a/k/a "Mak-11,"                      )
ALEXANDER LOCKLEAR,                    )
    a/k/a "AR,"                              )
KYLE OREE,                                         )
    a/k/a "Nasty Nu,"                    )
    a/k/a "Nasty,"                         )
TIMECA PARKER BISHOP,               )
RAVEN SYMONE ROBERTS,              )
KEISHAUN SNEAD,                            )
    a/k/a "Trig,"                            )
CALVIN STOKES,                               )
    a/k/a "Cavi Stokes,"               )
    a/k/a "Trill,"                           )
REKORA THOMPSON,                        )
    a/k/a "Rockabye,"                   )
    a/k/a "Rock,"                          )
JAMES THORNE,                               )
    a/k/a" Nasty Knuckles,"          )
    a/k/a "Knuckles,"                    )
    a/k/a "Knuc,"                          )
ANTWON WADE,                               )
    a/k/a "Ap Gudda,"                   )
TRAVARIUS WALKER,                       )
    a/k/a "Blaze,"                          )
JOSEPH WASHINGTON,                     )
    a/k/a "Gotti,"                           )
MICHAEL ANTHONY WILLIAMS,    )
    a/k/a "Take Off"                      )

THE GRAND JURY CHARGES:

## COUNT ONE

*RICO Conspiracy*
18 U.S.C. § 1962(d)

### Background

At all times relevant to this Indictment:

1.    In the early 1970s, a group of street gangs united and formed a larger gang called "The Bloods." This gang originated in Los Angeles, California, but spread

to other areas. In the 1990s, the "United Bloods Nation" ("UBN") formed as the East Coast offshoot of the California-based Bloods. "The Bloods" now exist throughout the United States.

2.      "The Bloods" are broken into individual units known as "sets." Sex Money Murder ("SMM") is an independent set of "The Bloods." SMM was established in or around 1989, primarily by Peter Rollack, a/k/a "Pistol Pete." SMM began as a local street gang in the Soundview section of the Bronx. In the mid-1990s, SMM aligned with UBN in prison. When SMM was predominantly active in Soundview, Sean Carr, a/k/a "Nut," a/k/a "Nutkase," as well as defendant **ROBINSON LAZALA**, a/k/a "Mak 11," rose to prominence in the gang. By the 2000s, SMM had withdrawn from UBN and established itself as an independent set of "The Bloods." Since its inception, SMM has spread from the Bronx and New York to areas across the East Coast, including Georgia, where it operates inside and outside of prisons and jails.

3.      Although SMM's leadership structure spans multiple states, each state typically has subgroups, also called "sets" or "lines," which are responsible for carrying out the affairs of the gang within their individual territories. Typically, each set or line is responsible for representing SMM through the commission of criminal activities, the generation of financial proceeds, the resolution of internal and external conflict, and the enforcement of strict adherence to SMM rules and protocols. The structure of SMM is hierarchical in nature. Each set or line has its own "line-up," or hierarchy of ranked gang members from each territory. A set or line and its leaders fall under higher ranked national leaders, including the "Royal Flush," as defined below, and are ultimately subject to the overall command of "Royal Flush" members.

4.      Historically, in Georgia, SMM members were organized into four separate lines. However, due to intra-gang disputes and other factors, these lines have changed structure and leadership over time. Starting in no later than in or around 2018, SMM in Georgia organized into two lines: "G-20" and "95 Lifestyle/45 World-Wide" (hereinafter "95 line"). G-20 emerged as a remnant of "Rough Sex," one of the original Georgia lines. At the same time, some former leaders of "Rough Sex" formed a separate gang under UBN called the "Imperial South Bloods" ("ISB").

5.      Certain SMM members hold a specific rank within the gang or within a specific set or line. Specific duties and responsibilities are associated with each rank. The SMM rank structure often includes a delineation between incarcerated members ("behind the wall") and non-incarcerated members ("on the streets"). In many instances, leadership "behind the wall" also exerts control over membership "on the streets." Rank structure and responsibilities sometimes vary "behind the wall" and "on the streets," but are typically arranged as follows:

a.      "Royal Flush" – five individuals who are founding members of SMM with nationwide control;

b.      "Magnificent Seven" – consists of the Royal Flush and two additional members; the two additional members have nationwide influence over SMM activity but have less control than the Royal Flush members;

c.      "CEO" formerly known as "Big Gunz" – the highest-ranking members within a state, usually with national recognition;

d.  "President" formerly known as "High" or "Hi" – a regional or state-level leader with authority over a specific line within a given territory, who reports to higher-ranking members;

e.  "Vice President" formerly known as "Low" or "Lo" – a lower-ranking regional or state-level leader with authority over a specific line within a given territory, who reports to higher-ranking members;

f.  "General Manager" formerly known "Fifth Floor" – a ranking member in charge of a local gang set;

g.  Fourth through First "Floors" – local-ranking members with the Fourth Floor being the highest rank and the First Floor being the lowest rank;

h.  "Scrap" or "skrap" – a SMM member without rank.

6.  SMM is governed by a common set of rules, codes, laws, and oaths. Members are required to pay monetary dues. Monies collected are used to pay for items used in criminal activities, including guns, to aid other gang members, or to enrich leaders, members, and associates. SMM members and associates use specific words, codes, and abbreviations to communicate with one another. Some commonly used examples are:

a.  "Big Brother;"

b.  "Dub;"

c.  "Eat a plate" or to be "ate" – targeting of an individual, who may or may not be a SMM member, for physical attack, including murder;

d. "Green light" or "Smash on sight" – permission granted by a higher-ranking SMM member to commit a physical attack, including murder;

e. "On the street" or "the hood" – an individual who is not in prison, or a reference to being outside of prison;

f. "Behind the wall" or "G-wall" – an imprisoned individual, or a reference to being inside a prison or other correctional facility;

g. "Stain" – respect or rank within the gang;

h. "Peter roll" – to kill someone;

i. "Billy Ocean" – to stab or shoot someone;

j. "Aid and assistance" or "A&A" – helping a fellow gang member;

k. "Ola" – a term of respect used when a lower-ranking member addresses a higher-ranking member;

l. "Dragon" or "Red Dragon" – an individual who engages or has engaged in homosexual activity, a violation of SMM rules; and

m. "Kitty" – collection of money funded by dues and proceeds of criminal activity used to assist gang members and fund further criminal activity.

**The Enterprise**

7.    At all times relevant to this Indictment, there existed in the Southern District of Georgia, and elsewhere, an organization, namely, Sex Money Murder (defined above as "SMM"). SMM, including its leaders, members, and associates, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4) — that is, a group of individuals associated in fact, that engaged in, and the activities

of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

## Purposes of the Enterprise

8.     The purposes of the SMM enterprise included, but were not limited to, the following:

  a.     Enriching the leaders, members, and associates of the enterprise through, among other things, drug trafficking, wire fraud, and bank fraud, and introducing contraband, including drugs and cellphones, into prisons and jails;

  b.     Preserving and protecting the power, reputation, territory, operations, and proceeds of the enterprise through the use of threats, intimidation, and violence, including, but not limited to, acts involving murder, kidnapping, and other acts of violence;

  c.     Keeping victims and witnesses of the enterprise's crimes in fear of the enterprise, and in fear of its leaders, members, and associates through threats of violence and actual violence, including acts involving murder, and assault; and

  d.     Providing financial aid and assistance, including, but not limited to, posting bonds and funding commissary accounts, to members of the enterprise charged with or incarcerated for gang-related activities.

## The Racketeering Conspiracy

9.    Beginning on a date unknown, but starting no later than in or around 2019, and continuing to at least the date of this Indictment, in the Southern District of Georgia, and elsewhere, the defendants,

ANTWOINE ALLEN,
a/k/a "Bity,"
CALVIN CHEGE,
a/k/a "Breezy,"
ANTONIO CLARK,
a/k/a "Ya-Yo,"
AMIR DOUGLAS,
a/k/a "Hotboy,"
LATOYA EDWARDS,
a/k/a "K-Murda,"
IMANI GORDON,
a/k/a "Juicy,"
BYRON HOPKINS,
a/k/a "Kosher,"
BRIAN HORNE,
a/k/a "Braveheart,"
QUINN HOWARD,
a/k/a "Q,"
a/k/a "DB Que,"
LEROY JONES
a/k/a "Roy,"
TERRELL KING,
a/k/a "Drip,"
ROBINSON LAZALA,
a/k/a "Mak-11,"
KEISHAUN SNEAD,
a/k/a "Trig,"
CALVIN STOKES,
a/k/a "Cavi Stokes,"
a/k/a "Trill,"
REKORA THOMPSON,
a/k/a "Rockabye,"
a/k/a "Rock,"
JAMES THORNE,
a/k/a "Nasty Knuckles,"
a/k/a "Knuckles,"

a/k/a "Knuc,"
**TRAVARIUS WALKER,**
a/k/a "Blaze,"
**JOSEPH WASHINGTON,**
a/k/a "Gotti,"
and
**MICHAEL ANTHONY WILLIAMS,**
a/k/a "Take Off,"

each being a person employed by and associated with SMM, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with one another, and others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c); that is, to conduct and to participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined by Title 18, United States Code, Sections 1961(1) and (5), which pattern of racketeering consisted of:

   a.  multiple threats and acts involving:

       i.   murder, chargeable under Official Code of Georgia, Sections 16-5-1, 16-2-20, 16-4-1, and 16-4-8;

       ii.  robbery, chargeable under Official Code of Georgia, Sections 16-8-40, 16-8-41, 16-2-20, 16-4-1, and 16-4-8; and

   b.  multiple offenses involving:

       i.   drug trafficking, in violation of Title 21, United States Code, Sections 841 and 846; and

   c.  multiple acts indictable under:

       i.   Title 18, United States Code, Section 1951 (relating to interference with commerce, robbery, or extortion)

ii.   Title 18, United States Code, Section 1343 (relating to wire fraud);

iii.   Title 18, United States Code, Section 1344 (relating to financial institution fraud); and

iv.   Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

10.   It was further part of the conspiracy that each defendant agreed a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

## Manner and Means of the Enterprise

11.   The manner and means by which members and associates of the SMM enterprise conducted and participated in the affairs of the enterprise included, but were not limited to, the following:

a. Members and associates of the enterprise attended regular meetings (in person or over conference call lines) where criminal activity and gang finances were discussed and disciplinary measures against fellow SMM members were discussed and decided.

b. To enforce discipline and enterprise rules, members and associates of the enterprise committed, and aided and abetted the commission of, acts involving murder, assault, and threats of bodily injury against those members and associates of the enterprise who violated rules, questioned authority, were suspected of cooperating with law enforcement, or otherwise posed any real or perceived threat to leaders, members, or purposes of the enterprise.

c. To generate income, leaders, members, and associates of the enterprise distributed, agreed to distribute, and attempted to distribute methamphetamine, heroin, cocaine, marijuana, and other controlled substances, and committed, agreed to commit, and attempted to commit bank fraud, wire fraud, and money laundering.

d. Members were required to pay dues. Monies collected were used to enrich members of the enterprise, support incarcerated leaders, fund the purposes of the enterprise, and purchase items needed for the enterprise, including illegal drugs and firearms. Dues were sometimes funded from the proceeds of illegal activities such as drug trafficking.

e. Members and associates of the enterprise used gang-related terminology, codes, symbols, phrases, and hand gestures to demonstrate affiliation with the enterprise.

f. Members and associates of the enterprise coordinated with non-incarcerated SMM members and associates to traffic drugs, smuggle contraband into prisons, and commit violent acts and other acts of intimidation to further the purposes of the enterprise.

## Overt Acts

12.    In furtherance of the conspiracy, and to affect the object and purposes thereof, the defendants, **ANTWOINE ALLEN**, a/k/ "Bity" (**"ALLEN"**),  **CALVIN CHEGE**, a/k/a "Breezy" (**"CHEGE"**), **ANTONIO CLARK**, a/k/a "Ya-Yo" (**"CLARK"**), **AMIR DOUGLAS**, a/k/a "Hotboy" (**"DOUGLAS"**), **LATOYA EDWARDS**, a/k/a "K-Murda," (**"EDWARDS"**), **IMANI GORDON**, a/k/a "Juicy," (**"GORDON"**), **BYRON**

HOPKINS, a/k/a "Kosher," **BRIAN HORNE**, a/k/a "Braveheart" ("**HORNE**"),

**QUINN HOWARD**, a/k/a "DB Que," a/k/a "Que," ("**HOWARD**"), **LEROY JONES**,

a/k/a "Roy" ("**L. JONES**"), **TERRELL KING**, a/k/a "Drip," ("**KING**"), **ROBINSON**

**LAZALA**, a/k/a "Mak-11," ("**LAZALA**"), **KEISHAUN SNEAD**, a/k/a "Trig,"

("**SNEAD**"), **CALVIN STOKES**, a/k/a "Cavi Stokes," a/k/a "Trill," ("**STOKES**"),

**REKORA THOMPSON**, a/k/a "Rockabye," a/k/a "Rock," ("**THOMPSON**"), **JAMES**

**THORNE**, a/k/a "Knuckles," a/k/a "Nasty Knuckles," a/k/a "Knuc," ("**THORNE**"),

**TRAVARIUS WALKER**, a/k/a "Blaze," ("**WALKER**"), **JOSEPH WASHINGTON**,

a/k/a "Gotti," ("**WASHINGTON**"), and **MICHAEL ANTHONY WILLIAMS**, a/k/a

"Take Off," ("**WILLIAMS**"), and others known and unknown to the Grand Jury,

committed and caused to be committed various overt acts, including, but not limited

to, the following:

(OA-1)    On an unknown date, but no later than July 28, 2019, **THORNE**,
**HOPKINS**, **HOWARD**, and **WILLIAMS** facilitated the sale and
distribution of marijuana in the Hinesville, Georgia, area.

(OA-2)    On an unknown date, but no later than on or about February 24,
2020, SMM member O.A. expressed a desire to leave the gang and
alleged that **HOPKINS** had impregnated an underage female.

(OA-3)    On or about February 24, 2020, **WILLIAMS**, who was O.A.'s "big
brother" in the gang, text messaged O.A. and told O.A. he needed
to attend an SMM meeting.

(OA-4)    On or about February 24, 2020, **WILLIAMS**, **HOPKINS**,
**HOWARD**, S.W., and B.B. traveled to a residence located in
Liberty County, Georgia, picked up O.A., and drove O.A. to a

location in Long County, Georgia, where **HOPKINS** shot O.A. to death.

(OA-5)  On an unknown date, but no later than on or about June 2, 2020, **THORNE** ordered another SMM member to dispose of the gun **HOPKINS** had used to kill O.A.

(OA-6)  On or about February 19, 2021, defendant Kyle Oree (not charged in this count), directed **THORNE** to provide gang dues to be used to pay for a website for Listen to the Kids ("LTTK"), a nonprofit organization that listed defendants Kyle Oree as CEO and **THORNE** as Secretary; and directed **THORNE** to setup a bank account for the organization so that they could receive donations to be used to fund SMM.

(OA-7)  On or about March 8, 2021, **L. JONES** sold cocaine to a confidential informant for $1,600.

(OA-8)  On or about April 30, 2021, **HOWARD** sold marijuana to a confidential informant for $175.

(OA-9)  On or about July 28, 2021, **ALLEN** and **KING** discussed future drug transactions, combining their money together to make a large purchase of marijuana, breaking the marijuana down for sale, developing their client base, and pricing strategy for marijuana and cocaine.

(OA-10)  On August 6, 2021, **THORNE** and **ALLEN** discussed various strains of marijuana available for distribution and discussed methamphetamine each had for sale.

(OA-11)  On or about August 7, 2021, **HORNE** sent **ALLEN** a video depicting the inside of a residence captioned "POKER HOUSE" and **ALLEN** then reported receipt of the video to **KING.**

(OA-12)  On or about August 25, 2021, **KING** sold an individual one-eighth of an ounce of cocaine for $150.

(OA-13)  Between on or about August 28, 2021, and on or about September 1, 2021, **KING**, **SNEAD**, and **L. JONES** discussed a plan to rob a home in Glennville, Georgia, where drug proceeds were kept by an unknown male.

(OA-14)  On or about August 31, 2021, **KING** and **SNEAD** discussed a plan to use firearms and masks to carry out the robbery after conducting surveillance on the Glennville, Georgia, location the next day.

(OA-15)  On or about September 1, 2021, as **L. JONES**, **KING**, and **SNEAD** prepared to leave for the home invasion, the Liberty County Sherriff's Office arrested **L. JONES** for sale of cocaine.

(OA-16)  Between on or about August 31, 2021, and September 7, 2021, defendant Brandon Gilbert (not charged in this count) arranged to sell a Glock handgun to **ALLEN** in exchange for money and marijuana defendant Brandon Gilbert could then sell.

(OA-17)  Between in or around September 2021, and in or around May 2022, **ALLEN** and other SMM members "dubbed" SMM member J.G. on the suspicion he had cooperated with law enforcement officers.

(OA-18)  Between in or around September 2021, and in or around May 2022, **ALLEN**, **DOUGLAS**, **LAZALA**, defendant Kyle Oree (not charged in this count), and **KING** discussed killing J.G.

(OA-19)  On or about September 15, 2021, **ALLEN** called an SMM member and asked if anyone knew where J.G. was located and stated, "I promise I'm trying to find a nigga to blow his whole face off. I'm promise you I am bro."

(OA-20)  On or about October 19, 2021, **ALLEN** received a phone call from **GORDON**, who reported an unknown male had knocked on her apartment door in Atlanta, Georgia, while holding a firearm.

(OA-21)  On or about October 19, 2021, **ALLEN** directed **WALKER** to drive to the apartment in Atlanta, Georgia, and shoot at the unknown male in retaliation; **WALKER** procured a firearm and recruited additional unidentified SMM members to carry out the retaliatory hit.

(OA-22)  On or about October 19, 2021, **GORDON** provided **ALLEN** with an address and **ALLEN** directed **GORDON** to wait outside so **GORDON** could direct **WALKER** to the specific apartment occupied by the unknown male.

(OA-23)  On or about October 30, 2021, approximately 40 to 50 SMM members, including **ALLEN**, **CLARK**, and **HORNE** gathered at Bayboro Park, located in South Carolina, to conduct official SMM business, in which defendants Sean Carr, a/k/a "Nutcase" (not

charged in this indictment) and Kyle Oree (not charged in this count) called into the meeting from prison.

(OA-24)   Between on or about October 28, 2021, and on or about November 27, 2021, **ALLEN, CLARK, HORNE**, and **KING** discussed a plan to conduct surveillance, establish a perimeter, arm themselves with firearms, wear masks to disguise their identity, and rob a poker game (the "POKER HOUSE"), located in Eastman, Georgia, for money and marijuana.

(OA-25)   On or about October 28, 2021, **ALLEN** discussed the plan to rob the POKER HOUSE with **KING**, stating **HORNE, CLARK**, and **SNEAD** would assist in carrying out the robbery.

(OA-26)   On or about November 11, 2021, **ALLEN** and **KING** discussed using firearms with lights to blind everyone and tying the POKER HOUSE robbery victims up with zip ties.

(OA-27)   On or about November 11, 2021, **CLARK** contacted an unindicted coconspirator about the POKER HOUSE location and reported back to **ALLEN** and **HORNE** that the location was "busy" and almost no one at the location had a firearm.

(OA-28)   On or about November 19, 2021, **SNEAD** told **ALLEN** he would like to participate in the POKER HOUSE robbery but was unable to at that time; however, **SNEAD** said he would participate if the robbery was rescheduled to another date.

(OA-29)   On or about November 19, 2021, **ALLEN** told **SNEAD** he planned to bring defendant Alexander Locklear (not charged in this count)

to participate in the POKER HOUSE robbery; **SNEAD** then told **ALLEN** to bring SMM member Darvonte Blunt (not charged in this indictment) in addition to defendant Alexander Locklear.

(OA-30) From on or about November 27, 2021, through on or about November 28, 2021, **ALLEN** and **CLARK** traveled to Eastman, Georgia, to scout the POKER HOUSE location and reported to defendant **KING** that the location and setup was good for the robbery.

(OA-31) On or about November 8, 2021, SMM member Keylan Baker (not charged in this indictment) killed F.S. in Daytona Beach, Florida; Baker later messaged **ALLEN**, via text message and WhatsApp, requesting **ALLEN's** assistance fleeing the area.

(OA-32) In or around November 2021, **ALLEN**, **EDWARDS**, **THOMPSON**, and **CLARK** arranged for Baker to leave Florida and travel to the Southern District of Georgia to avoid law enforcement scrutiny and apprehension in Florida; law enforcement authorities located and arrested Baker in the Southern District of Georgia on or about January 31, 2022.

(OA-33) Between on or about November 8, 2021, and on or about November 19, 2021, **ALLEN** contacted several SMM members, including **CLARK**, **EDWARDS**, and **THOMPSON**, to help Baker flee from Daytona, Florida, to Clearwater, Florida.

(OA-34)  On or about November 3, 2021, **EDWARDS** told **ALLEN** she had six kilograms of methamphetamine she wanted to sell for $3,000 each.

(OA-35)  In or around December 2021, **CLARK** communicated with a confidential informant on Facebook messenger and agreed to sell the informant methamphetamine.

(OA-36)  On or about December 13, 2021, the confidential informant met with a known associate of **CLARK** in McRae, Georgia, and purchased 28 grams of methamphetamine.

(OA-37)  On or about January 15, 2022, **EDWARDS** told defendant Kyle Oree (not charged in this count) that SMM member Sean Carr, a/k/a "Nutcase" (not charged in this indictment) had sent **EDWARDS** three bundles of suboxone strips that were supposed to sell for $50 per strip but the package had been interdicted by law enforcement authorities.

(OA-38)  Between in or around November 2021 and continuing to at least in or around April 2022, defendants Kyle Oree (not charged in this count), **STOKES**, Hakeem Curry (not charged in this count), and other SMM members facilitated the sale and delivery of packages containing "sheets," or paper laced with methamphetamine, fentanyl, and controlled substances, with the intention to smuggle the contraband into state and federal prisons within the Southern District of Georgia and elsewhere.

(OA-39)  Between on or about February 11, 2022, and on or about April 9, 2022, **DOUGLAS** and an unindicted coconspirator communicated nearly 600 times via text message and phone call regarding large transactions of marijuana.

(OA-40)  On or about February 14, 2022, defendants Kyle Oree (not charged in this count) and Hakeem Curry (not charged in this count) discussed smuggling "sheets," papers laced with fentanyl, into prisons.

(OA-41)  On or about March 3, 2022, defendant Hakeem Curry (not charged in this count) explained to defendant Kyle Oree (not charged in this count) that the "sheets," papers laced with controlled substances had been smuggled into a prison located in the District of South Carolina and had been placed inside the front and back cover of a book.

(OA-42)  Between in or around January 2022, and on or about February 22, 2022, defendants Ryan Brandt (not charged in this count), Kyle Oree (not charged in this count), **DOUGLAS**, **LAZALA**, and **WASHINGTON** discussed killing C.P., an SMM member and inmate at Ware State Prison, on suspicion C.P. had cooperated with law enforcement officers in violation of gang rules.

(OA-43)  On or about January 5, 2022, **CHEGE** directed the stabbing of R.S., an SMM member and inmate at Smith State Prison, on suspicion R.S. was engaged in homosexual activity in violation of gang rules.

(OA-44)   On or about January 5, 2022, unindicted coconspirators carried out **CHEGE's** request and repeatedly stabbed R.S., causing multiple puncture wounds.

(OA-45)   On or about January 31, 2022, **CHEGE** explained to defendant Kyle Oree (not charged in this count) that he had followed protocol and the attack on R.S. had been sanctioned by defendant Ryan Brandt (not charged in this count).

(OA-46)   Between in or around January 2022, continuing through in or around May 2023, defendants Ryan Brandt (not charged in this count), Anthony Jernigan (not charged in this count), Kyle Oree (not charged in this count), and **LAZALA** discussed plans to kill **CHEGE** because he was deemed a "dub" based on various violations, including his decision to attack R.S.

(OA-47)   On or about January 15, 2022, SMM members stabbed **CHEGE**, puncturing his lung, while **CHEGE** was an inmate at Ware State Prison.

(OA-48)   On or about February 22, 2022, during a conference call with defendants Ryan Brandt (not charged in this count), Anthony Jernigan (not charged in this count), Kyle Oree (not charged in this count), and other high-ranking SMM members, **LAZALA** discussed that cooperating with law enforcement officers is not tolerated in SMM and members who cooperate "should be held accountable," in which all participants on the call agreed.

(OA-49)   During the conference call on or about February 22, 2022, defendants Ryan Brandt (not charged in this count), Anthony Jernigan (not charged in this count), Kyle Oree (not charged in this count), **LAZALA**, and other high-ranking SMM members, also discussed the fact that **CHEGE** had falsely accused R.S. of homosexual activity, which resulted in the attempted murder of R.S., and that **CHEGE** "should be held accountable" for ordering the hit on R.S.

(OA-50)   On or about February 22, 2022, in discussing what to do about **CHEGE**, defendant Anthony Jernigan (not charged in this count) stated, "Imma be the first one to say…His ass getting popped as soon as he come out the box," in which **LAZALA** responded the decision had to be made by "the two CEOs" – defendants Kyle Oree (not charged in this count) and Ryan Brandt (not charged in this count) – and asked them whether **CHEGE** should be held accountable.

(OA-51)   In response to **LAZALA**, on or about February 22, 2022, defendants Kyle Oree (not charged in this count) and Ryan Brandt (not charged in this count) made the decision that **CHEGE** should be killed for his violations; **LAZALA** told defendant Anthony Jernigan (not charged in this count) that it would be his "responsibility to tie up that loose end."

(OA-52)  On or about May 30, 2023, the Georgia Department of Corrections moved **CHEGE** from segregation to general population at Smith State Prison.

(OA-53)  On or about May 31, 2023, unindicted coconspirators repeatedly stabbed **CHEGE**, who was an inmate at Smith State Prison, causing multiple puncture wounds.

(OA-54)  Between at least as early as in or around August 2023 and in or around October 2023, **HORNE** and **CLARK**, along with other unindicted SMM members or associates, utilized drones to conduct prison drops of contraband and controlled substances around Georgia, including at Telfair State Prison and Ware State Prison.

(OA-55)  On or about September 17, 2023, **HORNE**, or someone directed by him to do so, used a drone to distribute contraband at Telfair State Prison after which the drone crashed into a tree.

(OA-56)  On or about September 18, 2023, **HORNE** and **CLARK**, or someone directed by them to do so, paid an individual to retrieve the drone from the tree.

(OA-57)  On or about October 5, 2023, **HORNE** possessed a drone that had been set up to conduct prison drops for contraband and controlled substances.

(OA-58)  Between in or around April 2020, and in or around April 2022, SMM members used the internet to submit applications for COVID-19 Economic Injury Disaster Loans (EIDL); COVID-19

Paycheck Protection Program (PPP) loans; and general unemployment benefits for fictitious businesses, for third parties, or while using false information at times when they had no right to obtain or apply for such funds.

(OA-59)   Between in or around April 2020, and in or around April 2022, SMM members discussed how to commit multiple types of fraud, including unemployment/PPP fraud, how to submit fraudulent applications and obtain funds, and how to avoid getting flagged for fraud.

(OA-60)   Between in or around July 2021 and in or around September 2021, **ALLEN** accessed a filed named "Scam Bible" on the file sharing website Mega.NZ and provided it to SMM members and associates.

(OA-61)   On or about April 5, 2020, **GORDON** submitted, or had someone utilizing her personal identifying information (PII) submit, an application for unemployment benefits with the State of Georgia.

(OA-62)   On or about May 21, 2020, **DOUGLAS** submitted, or had someone utilizing his PII, an application for unemployment benefits with the State of New York.

(OA-63)   On or about June 11, 2020, defendant Anthony Jernigan (not charged in this count) submitted, or had someone utilizing his PII, an application for unemployment benefits with the State of Nevada.

(OA-64)  On or about June 21, 2020, defendant Hassan Harris (not charged in this count) submitted, or had someone utilizing his PII submit on his behalf, an application for unemployment benefits with the State of Georgia.

(OA-65)  On or about June 22, 2020, **THOMPSON** submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Georgia.

(OA-66)  On or about June 30, 2020, defendant Hassan Harris (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-67)  On or about June 30, 2020, **WALKER** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-68)  On or about July 1, 2020, **WASHINGTON** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Arizona.

(OA-69)  On or about July 7, 2020, defendant Kyle Oree (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-70)  On or about July 8, 2020, **THOMPSON** submitted, or had someone utilizing her PII submit, an EIDL application.

(OA-71)  On or about July 10, 2020, defendant Hassan Harris (not charged in this count) submitted, or had someone utilizing his PII submit,

an application for unemployment benefits with the State of California.

(OA-72)  On or about July 11, 2020, defendant Brandon Gilbert (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-73)  On or about July 14, 2020, **CHEGE** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-74)  On or about July 14, 2020, defendant Anthony Jernigan (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-75)  On or about July 14, 2020, defendant Alexander Locklear (not charged in this count) submitted, or had someone utilizing his PII submit on his behalf, an application for unemployment benefits with the State of Pennsylvania.

(OA-76)  On or about July 15, 2020, **L. JONES** submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-77)  On or about July 18, 2020, defendant Timeca Parker Bishop (not charged in this count) submitted, or had someone utilizing her PII submit, an EIDL application.

(OA-78)  On or about July 22, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing her PII

submit, an application for unemployment benefits with the State of Nevada.

(OA-79)   On or about July 27, 2020, **GORDON** submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of California.

(OA-80)   On or about August 2, 2020, **WASHINGTON** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-81)   On or about August 6, 2020, **THOMPSON** submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Hawaii.

(OA-82)   On or about August 7, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Georgia.

(OA-83)   On or about August 15, 2020, defendant Kyle Oree (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-84)   On or about August 17, 2020, **HOWARD** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of California.

(OA-85)   On or about August 17, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing

her PII submit, an application for unemployment benefits with the State of Arizona.

(OA-86)   On or about August 18, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Idaho.

(OA-87)   On or about August 18, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Pennsylvania.

(OA-88)   On or about August 18, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of West Virginia.

(OA-89)   On or about August 19, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Indiana.

(OA-90)   On or about August 19, 2020, defendant Raven Symone Roberts (not charged in this count) submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Nebraska.

(OA-91) On or about August 23, 2020, **EDWARDS** submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of South Carolina.

(OA-92) On or about September 12, 2020, **GORDON** submitted, or had someone utilizing her PII submit, an EIDL application.

(OA-93) On or about September 14, 2020, **EDWARDS** submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of West Virginia.

(OA-94) On or about September 16, 2020, **CHEGE** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Arizona.

(OA-95) On or about September 16, 2020, defendant Brandon Gilbert (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Arizona.

(OA-96) On or about September 18, 2020, **HOWARD** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-97) On or about October 2, 2020, defendant Anthony Jernigan (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-98) On or about October 6, 2020, **STOKES** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Arizona.

(OA-99)  On or about October 8, 2020, defendant Anthony Jernigan (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-100) On or about October 29, 2020, defendant Kyle Oree (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-101) On or about November 18, 2020, **CHEGE** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Pennsylvania.

(OA-102) On or about December 10, 2020, defendant Timeca Parker Bishop (not charged in this count) submitted, or had someone utilizing her PII submit, an application for unemployment benefits with the State of Georgia.

(OA-103) On or about January 5, 2021, defendant Antwon Wade (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-104) On or about January 20, 2021, defendant Alexander Locklear (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-105) On or about February 3, 2021, **HOWARD** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Pennsylvania.

(OA-106) On or about February 21, 2021, **CHEGE** submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-107) On or about March 4, 2021, defendant Kyle Oree (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-108) On or about March 14, 2021, **CHEGE** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Virginia.

(OA-109) On or about March 18, 2021, **WILLIAMS** submitted, or had someone utilizing his PII submit, a PPP loan application.

(OA-110) On or about March 21, 2021, **STOKES** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of North Carolina.

(OA-111) On or about March 28, 2021, defendant Anthony Jernigan (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-112) On or about April 4, 2021, defendant Anthony Jernigan (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-113) On or about April 21, 2021, defendant Hassan Harris (not charged in this count) submitted, or had someone utilizing his PII submit, a PPP loan application.

(OA-114) On or about April 25, 2021, defendant Hassan Harris (not charged in this count) submitted, or had someone utilizing his PII submit, a PPP loan application.

(OA-115) On or about April 27, 2021, **STOKES** submitted, or had someone utilizing his PII submit, a PPP loan application.

(OA-116) On or about May 3, 2021, **CHEGE** submitted, or had someone utilizing his PII submit, a PPP loan application.

(OA-117) On or about May 4, 2021, **SNEAD** submitted, or had someone utilizing his PII submit, a PPP loan application.

(OA-118) On or about May 6, 2021, defendant Brandon Gilbert (not charged in this count) submitted, or had someone utilizing his PII submit, a PPP loan application.

(OA-119) On or about May 16, 2021, defendant Anthony Jernigan (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-120) On or about June 14, 2021, **THOMPSON** submitted, or had someone utilizing her PII submit, an EIDL application.

(OA-121) On or about June 17, 2021, Brandon Jones (not charged in this count submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-122) On or about June 21, 2021, **HOWARD** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of North Dakota.

(OA-123) On or about June 28, 2021, **EDWARDS** submitted, or had someone utilizing her PII submit, an EIDL application.

(OA-124) On or about July 6, 2021, **ALLEN** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-125) On or about July 14, 2021, **CLARK** submitted, or had someone utilizing his PII submit, an EIDL application on behalf of Listen to the Kids, a nonprofit organization.

(OA-126) On or about July 14, 2021, defendant Kyle Oree (not charged in this count) submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-127) On or about July 19, 2021, **CLARK**, on behalf of **ALLEN**, submitted an EIDL application.

(OA-128) On or about July 19, 2021, **CLARK** sent **ALLEN** a screenshot from www.covid19relief.sba.gov indicating the application had been submitted and was connected to Timeca Parker Bishop's (not charged in this count) email address.

(OA-129) On or about July 26, 2021, defendant Kyle Oree (not charged in this count) submitted, or had someone utilizing his PII submit on his behalf, an EIDL application.

(OA-130) On or about August 2, 2021, **CHEGE** submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-131) On or about August 4, 2021, **STOKES** submitted, or had someone utilizing his PII submit, an EIDL application.

(OA-132) On or about August 4, 2021, **WALKER** provided **ALLEN** screenshots of applications from the California Economic Development Department (EDD) and counseled **ALLEN** on how to complete them including telling **ALLEN** to look for temporarily closed salons or barbershops to use for business addresses.

(OA-133) On or about August 8, 2021, **ALLEN** asked **WALKER** to confirm that he was using the correct website for EDD and **WALKER** continued to offer guidance on how to fill out the application.

(OA-134) Between on or about August 7, 2021, and on or about August 20, 2021, **ALLEN** and defendant Raven Symone Roberts (not charged in this count) discussed filing for unemployment benefits for Raven Symone Roberts with the help of defendant Timeca Parker-Bishop (not charged in this count) in the State of California.

(OA-135) On or about August 13, 2021, **ALLEN** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of California.

(OA-136) On or about August 14, 2021, **WILLIAMS** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of California.

(OA-137) Between on or about August 20, 2021, and on or about August 28, 2021, defendant Brandon Jones (not charged in this count) and **ALLEN** discussed filing for unemployment benefits in California on behalf of Brandon Jones.

(OA-138) Between on or about August 22, 2021, and on or about August 30, 2021, **WALKER** and **ALLEN** discussed money received from EDD and a plan to backdate **ALLEN's** EDD request to receive larger sums of money.

(OA-139) On or about August 27, 2021, **ALLEN** and defendant Timeca Parker Bishop (not charged in this count) discussed paying for the use of a California based address as part of the benefits scheme and to how to split proceeds among coconspirators.

(OA-140) On or about August 27, 2021, defendant Alexander Locklear (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Colorado.

(OA-141) On or about August 28, 2021, **ALLEN** instructed defendant Brandon Jones (not charged in this count) to provide defendant Timeca Parker Bishop (not charged in this count) his email address to facilitate his filing for unemployment benefits in California.

(OA-142) On or about August 28, 2021, defendant Brandon Jones (not charged in this count) submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of California.

(OA-143) On or about January 26, 2022, **STOKES** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of California.

(OA-144) On or about March 7, 2022, **WILLIAMS** submitted, or had someone utilizing his PII submit, an application for unemployment benefits with the State of Georgia.

(OA-145) Between in or around July 2021 and continuing through at least in or around December 2022, **ALLEN**, **CLARK**, **KING**, **WALKER**, defendant Timeca Parker Bishop (not charged in this count), defendant Antwon Wade (not charged in this count), and other SMM members and associates, known and unknown, exploited vulnerabilities to gain unauthorized access to numerous accounts within several banks, including but not limited to BB&T, Navy Federal Credit Union, Sun Trust//Truist, PNC, and Bank of America, and did obtain or attempt to obtain funds from those accounts.

(OA-146) On or about August 2, 2024, defendant Brandon Jones (not charged in this count) submitted or had someone utilizing his PII submit on his behalf, an application for unemployment benefits with the State of Texas.

### Notice of Special Sentencing Factors as to Count One

13.    As part of his agreement to conduct and participate in the conduct of the affairs of the SMM enterprise through a pattern of racketeering activity, in the Southern District of Georgia, and elsewhere, on or about February 24, 2020, the defendant, **BYRON HOPKINS**, did unlawfully and with malice aforethought, either express or implied, cause the death of O.A. by shooting him, in violation of Official Code of Georgia Sections 16-5-1 and 16-2-20.

14.    As part of their agreement to conduct and participate in the conduct of the affairs of the SMM enterprise through a pattern of racketeering activity, in the Southern District of Georgia and elsewhere, the defendants, **ANTWOINE ALLEN**, **ANTONIO CLARK**, **AMIR DOUGLAS**, and **LATOYA EDWARDS** did agree to knowingly, intentionally, and unlawfully possess with intent to distribute and distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

15.    As part of his agreement to conduct and participate in the conduct of the affairs of the SMM enterprise through a pattern of racketeering activity, in the Southern District of Georgia and elsewhere, the defendant, **AMIR DOUGLAS**, did agree to knowingly, intentionally, and unlawfully possess with intent to distribute and distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

All in violation of Title 18, United States Code, Section 1962(d).

### COUNT TWO

*Murder in Aid of Racketeering*
18 U.S.C. §§ 1959(a) & 2

16.    The allegations contained in paragraphs 1 through 8 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

17.    At all times relevant to this Indictment, SMM, including its leaders, members, and associates constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that

engaged in, and the activities of which affected, interstate and foreign commerce. The SMM enterprise constituted an ongoing organization whose leaders, members, associates, and prospects functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

18.     At all times relevant to this Indictment, the SMM enterprise, through its leaders, members, and associates engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, offenses involving drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

19.     On or about February 24, 2020, in the Southern District of Georgia and elsewhere, the defendant,

**BYRON HOPKINS,**
**a/k/a "Kosher,"**

together and with others known and unknown to the Grand Jury, while aiding and abetting each other, for the purpose of gaining entrance to and maintaining and increasing position in SMM, an enterprise engaged in racketeering activity, did knowingly and unlawfully murder O.A., in violation of Official Code of Georgia, Sections 16-5-1(a) and 16-2-20.

In violation of Title 18, United States Code, Sections 1959(a)(1) and 2.

## COUNT THREE

*Causing Death Through the Use of a Firearm*
18 U.S.C. § 924(j)

20.     On or about February 24, 2020, in the Southern District of Georgia and elsewhere, the defendant,

**BYRON HOPKINS,**
**a/k/a "Kosher,"**

together and with others known and unknown to the Grand Jury, while aiding and abetting each other, did knowingly and intentionally use, carry, brandish, and discharge a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, Murder in Aid of Racketeering as alleged in Count Two of this Indictment, and in the course of such offense, did cause the death of O.A. through the use of a firearm, which killing was murder as defined by Title 18, United States Code, Section 1111(a).

All in violation of Title 18, United States Code, Sections 924(c)(1)(A) and (j), and Title 18, United States Code, Section 2.

## COUNT FOUR

*Conspiracy to Commit Murder in Aid of Racketeering*
18 U.S.C. § 1959(a)(5)

21.    The allegations contained in paragraphs 1 through 8 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

22.    At all times relevant to this Indictment, SMM, including its leaders, members, and associates constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The SMM enterprise constituted an ongoing organization whose leaders, members, associates, and prospects functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

23.　At all times relevant to this Indictment, the SMM enterprise, through its leaders, members, and associates engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, multiple threats and acts involving:

    a.　multiple threats and acts involving:

        i.　murder, chargeable under Official Code of Georgia, Sections 16-5-1, 16-2-20, 16-4-1, and 16-4-8;

        ii.　robbery, chargeable under Official Code of Georgia, Sections 16-8-40, 16-8-41, 16-2-20, 16-4-1, and 16-4-8; and

    b.　multiple offenses involving:

        i.　drug trafficking, in violation of Title 21, United States Code, Sections 841 and 846; and

    c.　multiple acts indictable under:

        i.　Title 18, United States Code, Section 1951 (relating to interference with commerce, robbery, or extortion)

        ii.　Title 18, United States Code, Section 1343 (relating to wire fraud);

        iii.　Title 18, United States Code, Section 1344 (relating to financial institution fraud); and

        iv.　Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

24.　Between at least in or around September 2021, and continuing until at least in or around May 2022, in the Southern District of Georgia and elsewhere, defendants,

**ANTWOINE ALLEN,**

a/k/a "Bity,"
**AMIR DOUGLAS,**
a/k/a "Hotboy,"
**ROBINSON LAZALA,**
a/k/a "Mak-11,"
**KYLE OREE,**
a/k/a "Nasty Nu,"
a/k/a "Nasty,"
and
**TERRELL KING,**
a/k/a "Drip,"

for the purpose of maintaining and increasing position in SMM, an enterprise engaged in racketeering activity, did knowingly and unlawfully conspire with each other, and with others known and unknown to the Grand Jury, to murder J.G., in violation of Official Code of Georgia Sections 16-5-1 and 16-4-8.

All in violation of Title 18, United States Code, Section 1959(a)(5).

## COUNT FIVE

*Conspiracy to Commit Murder in Aid of Racketeering – C.P.*
18 U.S.C. § 1959(a)(5)

25.    The allegations contained in paragraphs 1 through 8 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

26.    At all times relevant to this Indictment, SMM, including its leaders, members, and associates constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The SMM enterprise constituted an ongoing organization whose leaders, members,

associates, and prospects functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

27. At all times relevant to this Indictment, the SMM enterprise, through its leaders, members, and associates engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, multiple threats and acts involving:

    a. multiple threats and acts involving:

        i. murder, chargeable under Official Code of Georgia, Sections 16-5-1, 16-2-20, 16-4-1, and 16-4-8;

        ii. robbery, chargeable under Official Code of Georgia, Sections 16-8-40, 16-8-41, 16-2-20, 16-4-1, and 16-4-8; and

    b. multiple offenses involving:

        i. drug trafficking, in violation of Title 21, United States Code, Sections 841 and 846; and

    c. multiple acts indictable under:

        i. Title 18, United States Code, Section 1951 (relating to interference with commerce, robbery, or extortion)

        ii. Title 18, United States Code, Section 1343 (relating to wire fraud);

        iii. Title 18, United States Code, Section 1344 (relating to financial institution fraud); and

        iv. Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

28.    Between at least in or around January 2022 and continuing until at least on or about February 22, 2022, in the Southern District of Georgia and elsewhere, defendants,

**RYAN BRANDT,**
a/k/a "Street Life,"
a/k/a "Robert Kraft,"
**AMIR DOUGLAS,**
a/k/a "Hotboy,"
**ROBINSON LAZALA,**
a/k/a "Mak-11,"
**KYLE OREE,**
a/k/a "Nasty Nu,"
a/k/a "Nasty,"
**and**
**JOSEPH WASHINGTON,**
a/k/a "Gotti,"

for the purpose of maintaining and increasing position in SMM, an enterprise engaged in racketeering activity, did knowingly and unlawfully conspire with each other, and with others known and unknown to the Grand Jury, to murder C.P., in violation of Official Code of Georgia Sections 16-5-1 and 16-4-8.

All in violation of Title 18, United States Code, Sections 1959(a)(5) and 2.

### COUNT SIX

*Conspiracy to Commit Murder in Aid of Racketeering*
18 U.S.C. § 1959(a)(5)

29.    The allegations contained in paragraphs 1 through 8 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

30.    At all times relevant to this Indictment, SMM, including its leaders, members, and associates constituted an "enterprise," as defined in Title 18, United

States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The SMM enterprise constituted an ongoing organization whose leaders, members, associates, and prospects functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

31.    At all times relevant to this Indictment, the SMM enterprise, through its leaders, members, and associates engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, multiple threats and acts involving:

    a. multiple threats and acts involving:

        i. murder, chargeable under Official Code of Georgia, Sections 16-5-1, 16-2-20, 16-4-1, and 16-4-8;

        ii. robbery, chargeable under Official Code of Georgia, Sections 16-8-40, 16-8-41, 16-2-20, 16-4-1, and 16-4-8; and

    b. multiple offenses involving:

        i. drug trafficking, in violation of Title 21, United States Code, Sections 841 and 846; and

    c. multiple acts indictable under:

        i. Title 18, United States Code, Section 1951 (relating to interference with commerce, robbery, or extortion)

        ii. Title 18, United States Code, Section 1343 (relating to wire fraud);

        iii. Title 18, United States Code, Section 1344 (relating to financial

        institution fraud); and

        iv. Title 18, United States Code, Section 1956 (relating to the

        laundering of monetary instruments).

32.    Between at least in or around January 2022 and continuing until at least on or about May 2023, in the Southern District of Georgia and elsewhere, defendants,

**RYAN BRANDT,**
**a/k/a "Street Life,"**
**a/k/a "Robert Kraft,"**
**ANTHONY JERNIGAN,**
**a/k/a "Hell Raiser,"**
**ROBINSON LAZALA,**
**a/k/a "Mak-11,"**
**and**
**KYLE OREE,**
**a/k/a "Nasty Nu,"**
**a/k/a "Nasty,"**

for the purpose of maintaining and increasing position in SMM, an enterprise engaged in racketeering activity, did knowingly and unlawfully conspire with each other, and with others known and unknown to the Grand Jury, to murder Calvin Chege a/k/a "Breezy", in violation of Official Code of Georgia Sections 16-5-1 and 16-4-8.

All in violation of Title 18, United States Code, Sections 1959(a)(5) and 2.

## COUNT SEVEN

*Wire Fraud Conspiracy*
18 U.S.C. §§ 1343 and 1349

33.    Beginning at least in or around April 2020, and continuing until at least in or around April 2022, in the Southern District of Georgia and elsewhere, the defendants,

**ANTWOINE ALLEN,**
**a/k/a "Bity,"**
**CALVIN CHEGE,**
**a/k/a "Breezy,"**
**ANTONIO CLARK,**
**a/k/a "Ya-Yo,"**
**AMIR DOUGLAS,**
**a/k/a "Hotboy,"**
**LATOYA EDWARDS,**
**a/k/a "K-Murda,"**
**BRANDON GILBERT,**
**a/k/a "Blaxkdamenace,"**
**IMANI GORDON,**
**a/k/a "Juicy,"**
**HASSAN HARRIS,**
**a/k/a "Hocus,"**
**QUINN HOWARD,**
**a/k/a "Q,"**
**a/k/a "DB Que,"**
**ANTHONY JERNIGAN,**
**a/k/a "Hell Raiser,"**
**BRANDON JONES,**
**a/k/a "Big B,"**
**LEROY JONES**
**a/k/a "Roy,"**
**TERRELL KING,**
**a/k/a "Drip,"**
**ALEXANDER LOCKLEAR**
**a/k/a "AR,"**
**KYLE OREE,**
**a/k/a "Nasty Nu,"**
**a/k/a "Nasty,"**
**TIMECA PARKER BISHOP,**

RAVEN SYMONE ROBERTS,
KEISHAUN SNEAD,
a/k/a "Trig,"
CALVIN STOKES,
a/k/a "Cavi Stokes,"
a/k/a "Trill,"
REKORA THOMPSON,
a/k/a "Rockabye,"
a/k/a "Rock,"
ANTWON WADE,
a/k/a "Ap Gudda,"
TRAVARIUS WALKER,
a/k/a "Blaze,"
JOSEPH WASHINGTON,
a/k/a "Gotti,"
and
MICHAEL ANTHONY WILLIAMS,
a/k/a "Take Off,"

did knowingly and willfully combine, conspire, confederate, agree, and have an understanding with each other and others known and unknown to the Grand Jury, to knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts; and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds.

All in violation of Title 18, United States Code, Sections 1343 and 1349.

## Background

At all times relevant to the Indictment:

*Cares Act*

34.     On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which, among other things, created a new temporary federal program called Pandemic Unemployment Assistance ("PUA") that provided up to 39 weeks of unemployment benefits and funding to states for the administration of the program. An individual receiving PUA benefits could also receive a $600 weekly benefit in federal funds under the Federal Pandemic Unemployment Compensation ("FPUC") program if he or she was eligible for such compensation for the week claimed.

*American Rescue Plan Act of 2021*

35.     On March 11, 2021, the President signed the American Rescue Plan Act of 2021 ("ARPA") into law. Section 9011(a) of the ARPA extended the PUA program through on or before September 6, 2021. Section 9013 of the ARPA extended the FPUC program at $300 per week through the week ending on or before September 6, 2021. Section 9016 of the ARPA also extended the Pandemic Emergency Unemployment Compensation ("PEUC") program up to a maximum of 53 weeks and through September 6, 2021.

*Paycheck Protection Program*

36.    In addition to PUA benefits, the CARES Act authorized up to $349 billion in forgivable loans guaranteed by the Small Business Administration ("SBA") through the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized over $300 billion in additional PPP funding.

37.    To obtain a PPP loan, a qualifying business must submit a PPP loan application signed by an authorized representative of the business. The application requires the business, through its authorized representative, to acknowledge the program rules and to make certain affirmative representations and certifications. The business must also provide, among other things, average monthly payroll expenses, including supporting documentation, and the number of employees. These figures, and other information provided, are used to calculate the amount of money the business is eligible to receive under the PPP.

38.    PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually within 24 weeks of receiving the proceeds) and uses at least 60% of the PPP loan proceeds on payroll expenses.

*SBA – Emergency Injury Disaster Loan*

39.    The CARES Act also included funding for emergency financial assistance programs for small businesses, including the Economic Injury Disaster Loan ("EIDL") Program. The EIDL Program authorized up to $2 million in direct loans from the SBA to small businesses and was intended to provide economic relief to entities with 500 or fewer employees to assist in overcoming the temporary loss of revenue due to COVID-19. In addition to the original loan request, the program provided that an advance loan of up to $10,000 could be requested. In April 2020, Congress authorized over $484 billion in additional EIDL funding overseen by the SBA.

40.    In order to obtain an EIDL, a qualifying business owner must submit an EIDL application online with the SBA. During the application process, the applicant must state, among other things, the business' type of industry, the gross revenue for the last twelve months prior to the application date, the applicant's name and social security number, and the financial institution's routing number and bank account number for payment of the loan proceeds. The SBA additionally requires the applicant to file a certification, under penalty of perjury, that the information is correct and that he or she is legally eligible to apply for an EIDL.

41.    EIDL funds could be used for any normal operating expenses and working capital, including payroll, purchasing equipment, and paying off debt.

*Unemployment Insurance*

42.     Unemployment Insurance (UI) was a joint state and federal program that provided monetary benefits to eligible beneficiaries.  UI payments were intended to provide temporary financial assistance to lawful workers who were unemployed through no fault of their own.  Beginning in or around March 2020, in response to the COVID-19 pandemic, several federal programs expanded UI eligibility and increased UI benefits, including the Pandemic Unemployment Assistance Program (PUA), Federal Pandemic Unemployment Compensation (FPUC), and the Lost Wages Assistance Program (LWAP).

43.     The United States Department of Labor, Employment and Training Administration is the federal agency that provides oversight in the Federal-State Unemployment Insurance Program, which offers unemployment benefits to eligible workers who are unemployed through no fault of their own, as determined under state law, and who meet other state eligibility requirements. Unemployment Insurance ("UI") payments, also known as benefits, are intended to provide temporary financial assistance.

44.     State Workforce Agencies ("SWA"/"SWAs") oversee and/or administer the Unemployment Insurance program in respective states. In general, a person seeking UI benefits through these SWAs completes an online application that includes, among other things, the claimant's name, date of birth, social security number, and the reason why the claimant is unemployed. To be eligible for benefits, the claimant generally must: (1) have been recently employed in the state in which

the claim was filed, (2) be currently unemployed, (3) be able and available to work, and (4) be actively seeking suitable full-time employment. To obtain and to continue to obtain benefits, applicants also had to self-certify that they were available to work, in what state they were affected by COVID-19, and that all information provided on applications was true, among other things. Incarcerated individuals were not eligible to receive UI benefits.

45.    SWAs relied on the information provided in the applications to determine UI benefits eligibility. In some states, UI compensation funds are most often issued in the form of a direct deposit into the claimant's designated bank account. In other states, when a claimant files his or her application, the claimant can opt to receive payments by debit card. The debit card will then be mailed to a physical address and/or P.O. Box designated by the claimant. SWAs often utilize financial institutions, such as Bank of America or U.S. Bank, as their vendor to mail or ship the debit cards to the claimant. These financial institutions maintain account records, transaction records, and ATM transaction photographs among other items.

### Scheme and Artifice to Defraud

46.    As part of the scheme and artifice to defraud, the Defendants and others submitted applications for COVID-19 Paycheck Protection Program (PPP) loans; COVID-19 Economic Injury Disaster Loans (EIDL); and general unemployment benefits for fictitious businesses, for third parties, or while using false information at times when they had no right to obtain or apply for such funds.

47.   The Defendants utilized the internet to submit these applications electronically.   In doing so, the Defendant's submissions caused interstate wire communications.

48.   For approved applications, loan funds and unemployment benefits were paid to Defendants by SWAs, federal agencies, or by private lending companies. Payments were made by direct deposit into identified bank accounts or by electronically transferring funds onto debit cards issued by banks in the claimant's name.

### Execution of the Scheme

49.   On or about the dates set forth below, in the Southern District of Georgia and elsewhere, the Defendants indicated, aided and abetted by each other and by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, with the intent to defraud, caused to be transmitted by means of wire communication in interstate commerce the following wire transactions:

a.  COVID-19 PPP Loans

| Defendant Name | Date (on or about) |
|---|---|
| CHEGE | 4/16/2021 |
| GILBERT | 05/06/2021 |
| HARRIS | 05/12/2021 |
| ROBERTS | 4/28/2021 |
| SNEAD | 05/04/2021 |
| STOKES | 05/19/2021 |
| WILLIAMS | 03/18/2021 |

b. COVID-19 Economic Injury Disaster Loans

| Defendant Name | Date (on or about) |
|---|---|
| ALLEN and CLARK | 07/19/2021 |
| CLARK | 07/19/2021 |
| CHEGE | 02/21/2021 |
| | 08/02/2021 |
| EDWARDS | 06/28/2021 |
| GORDON | 09/12/2020 |
| HARRIS | 06/30/2020 |
| HOWARD | 03/26/2021 |
| JERNIGAN | 10/02/2020 |
| | 10/08/2020 |
| | 03/28/2021 |
| | 04/04/2021 |
| | 05/16/2021 |
| JONES, B | 06/17/2021 |
| JONES, L | 07/15/2020 |
| OREE | 08/15/2020 |
| | 10/29/2020 |
| | 03/04/2021 |
| | 07/14/2021 |
| | 07/26/2021 |
| PARKER BISHOP | 07/18/2020 |
| STOKES | 08/04/2021 |
| THOMPSON | 07/08/2020 |
| | 06/14/2021 |

c. Unemployment benefits

| Defendant | Date (on or about) | States(s) |
|---|---|---|
| ALLEN | 07/06/2021 | GA |
| | 08/13/2021 | CA |
| CHEGE | 07/14/2020 | GA |
| | 09/16/2020 | AZ |
| | 11/18/2020 | PA |
| | 03/14/2021 | VA |
| DOUGLAS | 05/21/2020 | NY |
| EDWARDS | 08/23/2020 | SC |
| | 09/14/2020 | WV |
| GILBERT | 09/16/2020 | AZ |

|  | 07/11/2020 | GA |
| GORDON | 04/05/2020 | GA |
|  | 07/27/2020 | CA |
| HARRIS | 06/21/2020 | GA |
|  | 07/10/2020 | AZ |
| HOWARD | 09/18/2020 | GA |
|  | 06/21/2021 | ND |
|  | 08/17/2020 | CA |
|  | 02/03/2021 | PA |
| JERNIGAN | 06/11/2020 | NV |
|  | 07/14/2020 | GA |
| JONES, B | 08/02/2024 | TX |
|  | 08/28/2021 | CA |
| LOCKLEAR | 07/14/2020 | PA |
|  | 01/20/2021 | GA |
|  | 08/27/2021 | CO |
| OREE | 07/07/2020 | GA |
| PARKER BISHOP | 12/10/2020 | GA |
| ROBERTS | 08/17/2020 | AZ |
|  | 08/18/2020 | ID |
|  | 08/19/2020 | IN |
|  | 08/18/2020 | WV |
|  | 08/07/2020 | GA |
|  | 08/18/2020 | PA |
|  | 08/19/2020 | NE |
|  | 07/22/2020 | NV |
| STOKES | 10/06/2020 | AZ |
|  | 03/21/2021 | NC |
|  | 01/26/2022 | CA |
| THOMPSON | 06/22/2020 | GA |
|  | 08/06/2020 | HI |
| WADE | 01/05/2021 | GA |
| WALKER | 06/30/2020 | GA |
| WASHINGTON | 07/01/2020 | AZ |
|  | 08/02/2020 | GA |
| WILLIAMS | 03/07/2022 | GA |
|  | 08/14/2021 | CA |

50.    The above violations were committed in relation to, or involving any

benefit authorized, transported, transmitted, transferred, disbursed, or paid in

connection with, a presidentially declared major disaster or emergency as those terms

are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency

Assistance Act; Title 42, United States Code, Section 5122.

All in violation of Title 18, United States Code, Sections 1343 and 1349.

## COUNT EIGHT

*Drug Conspiracy*
21 U.S.C. § 846

51.     On an unknown date, but no later than in or around 2018, and

continuing through the date of this indictment, in the Southern District of Georgia

and elsewhere, the defendants,

**ANTWOINE ALLEN,**
a/k/a "Bity,"
**ANTONIO CLARK,**
a/k/a "Ya-Yo,"
**HAKEEM CURRY,**
a/k/a "ET Hak,"
**AMIR DOUGLAS,**
a/k/a "Hotboy,"
**LATOYA EDWARDS,**
a/k/a "K-Murda,"
**BYRON HOPKINS,**
a/k/a "Kosher,"
**BRIAN HORNE,**
a/k/a "Braveheart,"
**QUINN HOWARD,**
a/k/a "DB Que,"
a/k/a "Q,"
**LEROY JONES**
a/k/a "Roy,"
**TERRELL KING,**
a/k/a "Drip,"
**KYLE OREE,**
a/k/a "Nasty Nu,"

a/k/a "Nasty,"
CALVIN STOKES,
a/k/a "Cavi Stokes,"
a/k/a "Trill,"
REKORA THOMPSON,
a/k/a "Rockabye,"
JAMES THORNE,
a/k/a "Knuckles,"
TRAVARIUS WALKER,
a/k/a "Blaze,"
JOSEPH WASHINGTON,
a/k/a "Gotti,"
and
MICHAEL ANTHONY WILLIAMS,
a/k/a "Take Off,"

did knowingly and willfully combine, conspire, confederate, agree, and have an understanding with one another and other persons known and unknown to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(l); that is, to knowingly and intentionally possess with intent to distribute a controlled substance, said conspiracy involving at least one of the following: (1) at least five hundred (500) grams of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance; (2) at least one hundred (100) grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; (3) at least 500 grams or more of a mixture and substance containing a detectable amount of cocaine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance, (4) at least 400 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, a Schedule II controlled substance, and (5) more than 50 kilograms of marihuana, a Schedule I

controlled substance; pursuant to Title 21, United States Code, Sections 841(b)(l)(A), 841(b)(l)(B), 841(b)(l)(C), and 841(b)(l)(E).

All in violation of Title 21, United States Code, Section 846.

## ALLEGATION OF PRIOR CONVICTIONS

52.    Before **ANTWOINE ALLEN** committed the offenses charged in Count 8 of the Indictment, **ANTWOINE ALLEN** had a final conviction for a serious drug felony, namely, a conviction under 21 U.S.C. § 841(a)(1) for which **ANTWOINE ALLEN** served a term of imprisonment of more than 12 months of imprisonment and for which **ANTWOINE ALLEN's** release from any term of imprisonment was within 15 years of the instant offenses.  As a result of that conviction, **ANTWOINE ALLEN** is subject to increased punishment under Title 21, United States Code, Sections 841(b) and 851.

53.    Before **HAKEEM CURRY** committed the offenses charged in Count 8 of the Indictment, **HAKEEM CURRY** had a final conviction for a serious drug felony, namely, a conviction under 21 U.S.C. §§ 846 for which **HAKEEM CURRY** served a term of imprisonment of more than 12 months of imprisonment and for which **HAKEEM CURRY's** release from any term of imprisonment was within 15 years of the instant offenses.  As a result of that conviction, **ANTONIO CLARK** is subject to increased punishment under Title 21, United States Code, Sections 841(b) and 851.

54.    Before **ANTONIO CLARK** committed the offenses charged in Count 8 of the Indictment, **ANTONIO CLARK** had a final conviction for a serious drug felony, namely, a conviction under 21 U.S.C. §841(a)(1) and 846 for which **ANTONIO**

**CLARK** served a term of imprisonment of more than 12 months of imprisonment and for which **ANTONIO CLARK's** release from any term of imprisonment was within 15 years of the instant offenses. As a result of that conviction, **ANTONIO CLARK** is subject to increased punishment under Title 21, United States Code, Sections 841(b) and 851.

55.    Before **LEROY JONES** committed the offenses charged in Count 8 of the Indictment, **LEROY JONES** had a final conviction for a serious drug felony, namely, a conviction under 21 U.S.C. § 841(a)(1) and 846 for which **LEROY JONES** served a term of imprisonment of more than 12 months of imprisonment and for which **LEROY JONES'** release from any term of imprisonment was within 15 years of the instant offenses. As a result of that conviction, **LEROY JONES** is subject to increased punishment under Title 21, United States Code, Sections 841(b) and 851.

## FORFEITURE ALLEGATION

56.    The allegations contained in Counts One, Two, Three, Seven, and Eight of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 924(d), 981(a)(1)(C), and 1963, Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c).

57.    Upon conviction of Count One of this Indictment, the Defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 1963(a):

a.  Any interest acquired or maintained in violation of 18 U.S.C. § 1962;

b.  Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the Defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962; and

c.  Any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

58.    The property to be forfeited includes, but is not limited to, a forfeiture money judgment, that is, a sum of money in United States currency, representing the amount of proceeds obtained as a result of the offense alleged in Count One.

59.    Upon conviction of Count Seven of this Indictment, the Defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or

personal, which constitutes or is derived from proceeds traceable to the offense, including but not limited to, a forfeiture money judgment, that is, a sum of money in United States currency representing the amount of proceeds obtained as a result of the offense alleged in Count Seven of this Indictment.

60.    Upon conviction of the offense alleged in Count Eight of this Indictment, the Defendants shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of said violations and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of said violations, including but not limited to, a forfeiture money judgment, that is, a sum of money in United States currency representing the amount of proceeds obtained as a result of the offense alleged in Count Eight of this Indictment.

61.    Upon conviction of any offense in this Indictment, the Defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearms and ammunition involved in or used in the commission of the offense.

62.    If any of the property described above, as a result of any act or commission of the Defendants:

> a.    cannot be located upon the exercise of due diligence;
>
> b.    has been transferred or sold to, or deposited with, a third party;
>
> c.    has been placed beyond the jurisdiction of the court;
>
> d.    has been substantially diminished in value; or

  e.  has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to

Title 18, United States Code, Section 1963(m) and Title 21, United States Code,

Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

      A True Bill.


      Foreperson


Tara M. Lyons
Acting United States Attorney

      Frank M. Pennington, II
      Assistant United States Attorney
      *Co-lead Counsel


Tania D. Groover
Assistant United States Attorney
Chief, Criminal Division

      Lisa M. Thelwell
      Trial Attorney
      *Co-lead Counsel